# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7778 | **DATE** | 12/19/2003 |
| **CASE TITLE** | GAFFRIG PERFORMANCE INDUSTRIES, INC vs. LIVORSI MARINE, INC. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Gaffrig Performance's request for an injunction against Livorsi Marine's use of any trademark or tradename incorporating the word GAFFRIG, or the use of such a mark on, or in connection with the sale of, any marine products, is **GRANTED**; and (2) LMI's federal trademark registrations for the GAFFRIG PRECISION INSTRUMENTS trademark (U.S. Registration No. 1,801,915); the GAFFRIG trademark (U.S. Registration No. 2,528,898); and the GAFFRIG II trademark (U.S. Registration No. 2,535,322) will be **CANCELLED**. All other relief is **DENIED**. Trial ends - bench.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | DEC 22 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | | 64 |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| JHC | courtroom deputy's initials | | | date mailed notice | |

U.S. DISTRICT COURT
CLERK
03 DEC 19 AM 4:09
01 03-0371
Date/time received in central Clerk's Office

mailing deputy initials



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GAFFRIG PERFORMANCE )
INDUSTRIES, INC., )
                                )
    Plaintiff/Counter-Defendant, )
                                )
         v. )
                                )
LIVORSI MARINE, INC., )
                                )
    Defendant/Counter-Plaintiff. )

Case No. 99 C 7778, 99 C 7822

Judge William J. Hibbler

Magistrate Judge Schenkier

## MEMORANDUM OPINION AND ORDER

On December 1, 1999, Livorsi Marine, Inc. ("LMI") brought an action against Gaffrig Performance Industries, Inc. ("GPI2") alleging (i) common law infringement of the GAFFRIG PRECISION INSTRUMENTS, GAFFRIG, and GAFFRIG II trademarks; (ii) false designation of origin and unfair competition; (iii) trademark dilution under the Lanham Act and common law; and (iv) trademark infringement, trademark imitation, trademark dilution, deceptive trade practices and consumer fraud under Illinois law for allegedly using the GAFFRIG and GAFFRIG PERFORMANCE INDUSTRIES marks in connection with the promotion and sale of the marine products listed in LMI's federal certificates of registration. On that same day, GPI2 sued LMI, alleging that LMI obtained the federal registration for its GAFFRIG PRECISION INSTRUMENTS trademark by fraudulent means, and that GPI2 had superior rights in the GAFFRIG marks, such that LMI's use of the GAFFRIG marks constitutes: (i) trademark infringement under 35 U.S.C. § 1114; (ii) false designation of origin in violation of 15 U.S.C. § 1125(a); and (iii) a deceptive trade practice

1



and consumer fraud under Illinois law. These actions were consolidated by stipulation of the parties on March 29, 2000.

After a bench trial was held before this Court on March 11, 12, 13, 14, and 15, 2002, the Court finds as follows:

## FINDINGS OF FACT

1. On July 24, 1984, James Gaffrig incorporated "Gaffrig Precision Instruments, Inc." ('GPI'). ((Amended) Joint Statement of Uncontested Facts ("Uncontested"), ¶ 4.)

2. James Gaffrig was the majority owner, chief executive, and president of GPI for the length of its existence. (Uncontested, ¶ 5.)

3. Andrew Gorchynsky was minority co-owner, director and secretary of GPI from 1988 until July 1990. (Trial Transcript ("Trial Tr.") at 354.)

4. Between 1984 and 1988, GPI began manufacturing and selling speedometers, mufflers, silencers, flame arrestors, headers and throttle brackets under the GAFFRIG PRECISION INSTRUMENTS and/or GAFFRIG marks. (Uncontested, ¶ 6.)

5. On April 12, 1988, Gaffrig, on behalf of GPI, entered into an Asset Purchase Agreement (APA) with Michael Livorsi. (Uncontested, ¶¶ 18-20.)

6. Under the APA, GPI sold, assigned, transfered, and conveyed to Livorsi the assets of GPI's speedometer business. The conveyance included certain quantities of: Pitot Tube, Pitot Tube Mount, AN #4 Hose Fitting, Speedo Head Fitting 1/4" NPT, Pitot Tube Fitting, Push-Lock Hose Feet, Pick-Up Assembles with Fittings; Liquid Filled Completed; Dry Gauges; Raw Gauges; Tell Tale Needles; Glycerin; Oil Tester; Screens; and Vinyl Wash. (APA, § 1, Exhibit ("Ex.") A.)

7. The APA gave Livorsi the exclusive right to use the GAFFRIG trademarks in connection with the manufacture and sale of speedometers and in advertising subject to the two-year limitation in Section 9 of the APA. (APA, §§ 1, 9.)

8. Section 1 of the APA stated that "Livorsi shall have the right to use the GAFFRIG PRECISION INSTRUMENTS trade name in connection with the manufacture and sale of speedometers and in advertising subject to Section 9 herein." (APA, § 1.)

9. Section 9 of the APA stated that "[i]n consideration of the purchase of the assets, GPI agrees that neither it nor James W. Gaffrig (who is a major shareholder of GPI) shall, during the

2

period of two years which commences on the closing date, directly or indirectly, engage in or render services to any business engaged in manufacturing or selling finished or semi-finished speedometers, or acquire an interest as stockholder, director, partner, agent or individual, in any such business." (APA, § 9.)

10. The APA did not restrict GPI from making and selling speedometers after two years, or from using of the GAFFRIG marks on speedometers or other products after the expiration of the license, on April 12, 1990. (APA, §§ 1-9.)

11. Gaffrig and GPI were not restricted from the manufacture or sale of other products, or from the use of the GAFFRIG marks on other products during this two year time. (APA, § 9(b)).

12. The APA stated that the purchase price for the speedometer assets was $20,000 minus the amount of liabilities of GPI to Livorsi. (APA, §2.)

13. On April 12, 1988, Livorsi and Gaffrig also entered into a "License Agreement" (LA). The APA stated that the LA, together with the APA, was to be considered an entire agreement. APA §17. In the LA, Gaffrig sold to Livorsi an exclusive license to manufacture, use, market and sell products based on or utilizing Gaffrig's patent no. 4,622,850 covering a certain pitot mount assembly. APA § 2.1. The license was to end on December 31, 1997. (APA, § 3.)

14. Under the LA, GPI kept ownership of at least one piece of equipment related to its speedometer business: a certain pitot tube mount described in United States patent NO. 462285, owned by Gaffrig. (LA, § 2.)

15. Under the LA, Livorsi agreed to pay Gaffrig a 3% royalty on annual sales of speedometers exceeding $50,000. (LA, § 5.1, Ex. A.)

16. Between 1988 and November 1990, GPI continued to manufacture and sell marine mufflers, silencers, flame arrestors, headers, and throttle brackets under the GAFFRIG PRECISION INSTRUMENTS and/or GAFFRIG marks. (Uncontested, ¶ 6.)

17. LMI was incorporated by Michael Livorsi on May 16, 1988. Livorsi is the owner and president of LMI. (Uncontested, ¶¶ 22-23.)

18. Livorsi and Gaffrig were the two directors of LMI. (Joint Written Consent by the Sole Shareholder and Directors of LMI, LMI Ex. 106.)

19. Livorsi began using the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks in connection with the promotion and sale of marine speedometers, pitot tubes and pitot tube mounts shortly after the APA was signed on April 12, 1988. (Uncontested, ¶ 24.)

3

20. By 1989, LMI expanded its line of marine products to include other types of marine instruments and marine gauges (e.g., tachometers and various types of fluid level and pressure gauges), and LMI used the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 25.)

21. GPI made an Assignment for the Benefit of Creditors (ABC) in October or November of 1990 because GPI was unable to pay its bank debts. (Trial Tr. at 656-58.)

22. On November 16, 1990, Gaffrig incorporated GPI2 as a new Illinois corporation. (Uncontested, ¶ 8.)

23. Gaffrig became the president and sole owner of GPI2. (Uncontested, ¶ 8.)

24. Most of GPI's employees continued to work for GPI2 in the same or similar positions to what they had in GPI: Robert Divilbiss continued to work as general manager; Michael Schultz continued to work in assembling and shipping parts; and Angel Castenada continued to work as a welder. (Trial Tr. at 56, 661-62.)

25. There was no written assignment of any assets from GPI to GPI2. (Uncontested, ¶ 9.)

26. Gaffrig moved some equipment from GPI to GPI2. (Trial Tr. at 56.)

27. On December 5, 1990, GPI's assets were auctioned off for the benefit of creditors in an ABC proceeding. ((Amended) Joint Statement of Contested Issues and Facts ("Contested"), ¶ 4.)

28. By December 9, 1990, LMI had expanded its product line to include vacuum gauges, trim meters, compasses, depth finders, tool cases, and instrument cases, and was using the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 26.)

29. By late 1990, GPI2 began manufacturing the same marine products – mufflers, silencers, flame arrestors, headers and throttle brackets – that had previously been manufactured and sold by GPI using the GAFFRIG and the GAFFRIG PERFORMANCE INDUSTRIES marks. (Uncontested, ¶ 12.)

30. By January 1991, GPI2 was also advertising and selling those same types of GAFFRIG marine products and continues to do so to this day. (Uncontested, ¶ 12.)

31. On February 1, 1991, Livorsi and Gaffrig entered into another written agreement whereby Gaffrig sold his rights under U.S. Patent No. 4,622,850, covering the pitot tube Gaffrig had previously licensed to Livorsi under the LA. In the February 1991 agreement, in exchange for certain consideration, Gaffrig agreed to refrain from making the pitot tubes covered by the patent until at least February 1, 2001, and he relinquished any interest in LMI's

4

instrument engine gauges business "which may currently exist from previous oral contracts." (GPI2 Ex. 39.)

32. Beginning in 1991, LMI purchased mufflers and flame arrestors from GPI2 and sold them bearing the GAFFRIG PRECISION INSTRUMENTS and LIVORSI MARINE trademarks. GPI2 was unaware at this time that LMI was removing the "Gaffrig Performance Industries, Inc." stickers from the mufflers and passing them off as its own. (Trial Tr. at 741, 760-61.)

33. In 1991, GPI2 began manufacturing at least samples of speedometer gauges. (Trial Tr. at 493.)

34. By 1991, GPI2 manufactured, advertised, and sold marine products, including at least mufflers, silencers, and flame arrestors, using the GAFFRIG PERFORMANCE INDUSTRIES and GAFFRIG marks. (Uncontested, ¶ 12.)

35. Beginning in 1991, LMI promoted its products bearing the GAFFRIG trademark in press releases in marine industry publications. (Uncontested ¶ 35.)

36. On December 2, 1991, GPI was dissolved involuntarily by the Illinois Secretary of State. (Uncontested ¶ 7.)

37. On March 9, 1992, LMI filed an application in the United States Patent and Trademark Office (PTO) to register the GAFFRIG PRECISION INSTRUMENTS trademark for use on the marine products it was currently selling, including engine monitoring devices, marine controls such as throttle handle assemblies, mufflers, silencers, and flame arrestors; marine navigational instrumetns including compasses and depth sounders; marine operational gauges and other devices including speedometers and pitot mount assemblies, tachometers, fuel, water and oil monitoring instruments, bilge monitors, and flow meters; and other boating accessories, and was using the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 29.)

38. In March 1992, LMI was aware that GPI2 was using a confusingly similar mark on at least mufflers and flame arrestors. (Trial Tr. at 760-61; Uncontested, ¶¶ 40-41.)

39. On June 4, 1992, the PTO initiated an office action in which it stated that LMI must "indicate whether 'Gaffrig' has any significance in the relevant trade, any geographical significance or any meaning in a foreign language;" and "disclaim the descriptive wording 'precision instruments' apart from the mark as shown" because the terms merely describe a feature of navigational instruments. (Uncontested, ¶ 30; LMI Ex. 2.)

40. On June 24, 1992, LMI responded that "[t]he name 'Gaffrig' has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments and has no geographical significance." LMI also agreed that "[n]o claim is made to the exclusive

5

right to use 'precision instruments' apart from the mark as shown." (Uncontested, ¶ 30; LMI Ex. 2.)

41. Mr. Gaffrig died in December 1992, at which point ownership of GPI2 passed to Mr. Gaffrig's widow, Patricia Gaffrig. (Uncontested, ¶¶ 10-11.)

42. LMI's trademark registration application was published for opposition on August 10, 1993, and went unopposed. (Uncontested, ¶ 31.)

43. In 1993, GPI2 and LMI entered into an oral agreement whereby GPI2 agreed to sell mufflers and flame arrestors to LMI for 20% under original equipment manufacturer (OEM) prices, and LMI agreed to sell speedometers and gauges to GPI2 for 20% under OEM prices. LMI sold GPI2's products as its own. GPI2 did not alter LMI's mark on the products. The parties continued this arrangement until at least 1997. (Trial Tr. at 577.)

44. LMI's trademark registration for the GAFFRIG PRECISION INSTRUMENTS trademark issued on November 2, 1993, as Registration No. 1,801,915. The goods for which the trademark applied were identified as: "Marine instruments and controls, namely: engine monitoring devices, throttles, tachometers, memory tachometers, controls, and mufflers; marine navigational instruments, namely compasses and depth sounders; and marine operational devices, namely, both liquid filled and dry speedometers, pitot mount assemblies, both electronic and mechanical monitoring instruments for fuel and oil pressure, fuel level, trim, water and oil temperature, water and fuel pressure and vacuum boost, water temperature indicators, bilge monitors, and flo-meters, together with all parts thereof." (Uncontested, ¶ 31.)

45. By 1995, GPI2 was aware that LMI was removing the GAFFRIG PERFORMANCE INDUSTRIES stickers from the mufflers, and continued selling the mufflers to LMI. (Trial Tr. at 313.)

46. Since 1997, LMI has also used the GAFFRIG II mark on its marine products and packaging advertised in the U.S. and abroad. (Uncontested, ¶¶ 33-34.)

47. Mike Schultz purchased GPI2 from Ms. Gaffrig in January 1997 and is currently the owner and president of the company. (Uncontested, ¶¶ 13-14.)

48. On March 17, 1997, Livorsi sent Schultz a letter stating that he considered GPI2's use of the GAFFRIG PERFORMANCE INDUSTRIES mark to be an infringement of Livorsi's registered GAFFRIG PRECISION INSTRUMENTS trademark. (Uncontested, ¶ 38.)

49. On September 7, 1999, LMI filed with the PTO a Combined Declaration of Use and Incontestability under 15 U.S.C. §§ 1058 and 1065 in connection with the GAFFRIG PRECISION INSTRUMENTS trademark. (Uncontested, ¶ 36.)

50. The Declaration was accepted and acknowledged by the PTO, and the GAFFRIG PRECISION INSTRUMENTS trademark registration was granted incontestible status. (Uncontested, ¶ 37.)

51. LMI has continued its use of the GAFFRIG, GAFFRIG PRECISION INSTRUMENTS, and GAFFRIG II marks in connection with the promotion and sale of its line of marine products to the present day. (Uncontested, ¶ 32.)

52. GPI2 currently sells marine mufflers, silencers, flame arrestors, throttle brackets, speedometers, and other various types of marine gauges and instruments with the GAFFRIG marks and the GAFFRIG PERFORMANCE INDUSTRIES mark. (Uncontested, ¶¶ 15-16.)

## CONCLUSIONS OF LAW

I. **Trademark Infringement and Unfair Competition under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1114; Trademark Dilution and Unfair Competition Arising Under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2; and Deceptive Practices Arising Under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2.**

Both LMI and GPI2 allege that the other committed common law trademark infringement and unfair competition under the Lanham Act,[1] deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, and various violations under the Illinois Consumer Fraud and Deceptive Business Practices Act. GPI2 claims that LMI's continued use of the GAFFRIG, GAFFRIG PRECISION INSTRUMENTS, and GAFFRIG II marks and registration of the GAFFRIG PRECISION INSTRUMENTS mark after its license to use the mark expired was in derogation of GPI2's senior rights and constituted trademark infringement, unfair competition, and a violation of

---

[1]LMI's claim of trademark infringement under 765 ILCS §1035/15 does not apply here. This statute was repealed in 1998, and its closest current equivalent is 765 ILCS §1036/65. Section 1036/65, however, only provides a remedy for dilution of a mark that is so inherently distinctive that it is "famous." LMI, however, does not argue and provides no evidence of the eight factors under the statute that could make the GAFFRIG marks famous. Even if the GAFFRIG marks were found to be famous, however, LMI's claims under 765 ILCS § 1035/15 would be analyzed in the same manner as the other claims in this section.

the aforementioned Illinois statutes. LMI claims that GPI2's continued use of the GAFFRIG, GAFFRIG PRECISION INSTRUMENTS, and GAFFRIG PERFORMANCE INDUSTRIES marks after LMI acquired secondary meaning in the marks and registered the marks constituted trademark infringement, unfair competition, and a violation of the aforementioned Illinois statutes. Section 43 of the Lanham Act provides that:

> [a]ny person who, on or in connection with goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof . . . which – is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Lanham Act, § 43, 15 U.S.C. § 1125(a)(1)(A).

A trademark is any word, name, symbol or device, or any combination of those, that is adopted and used by a manufacturer or a merchant to identify its products and to distinguish them from those manufactured or sold by others, or to designate the source or origin of a product, usually the manufacturer or seller of the product. Lanham Act, § 45, 15 U.S.C. § 1127; *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 953 (7th Cir. 1992). To prove trademark infringement or unfair competition under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1114, the parties must establish that (i) they own a valid, protectable mark; and (ii) the use of either the same or a similar mark by the accused party creates a likelihood of consumer confusion as to the source of goods sold under the mark. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001); *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). "Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act," and thus, a party cannot prevail

on its claims under the Deceptive Trade Practices Act, 815 ILCS § 510/2, or the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2, if the party does not own a valid, protectable mark. *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994) (citing *Gimix, Inc v. JS&A Group, Inc.*, 699 F.2d 901, 908 (7th Cir. 1983); *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 104-05, 466 N.E.2d 1004 (1st Dist. 1984) (Illinois courts look to federal case law and apply the same analysis to state infringement claims). A party who has not registered its marks with the PTO bears the burden to establish protection under the Lanham Act. *Platinum*, 149 F.3d at 727.

## A. Likelihood of Confusion

In this case, the parties agree that the GAFFRIG PRECISION INSTRUMENTS, GAFFRIG, GAFFRIG II, and GAFFRIG PERFORMANCE INDUSTRIES marks (collectively, the "GAFFRIG marks") are confusingly similar to consumers when used in connection with the promotion and sale of the marine products manufactured, advertised, and/or sold by both parties, and consumers of the marine products manufactured, advertised, and/or sold by both parties have suffered actual confusion caused by the parties' use of their respective marks. Both parties currently sell marine mufflers, silencers, flame arrestors, throttle brackets, speedometers, and other various types of marine gauges and instruments. The likelihood of confusion, however, easily extends to the rest of the marine items sold by LMI: engine monitoring devices, throttle controls, marine navigational instruments including compasses and depth sounders, marine, tachometers, fuel, water and oil monitoring instruments, bilge monitors, flow meters and other boating accessories. In assessing the likelihood of consumer confusion, the Seventh Circuit considers:

(1) the similarity between the marks in appearance and suggestion, (2) the similarity

9

of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's. None of these factors are dispositive and the proper weight given to each will vary in each case. However, the similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance.

*Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002) (internal citations omitted). The parties agree on the similarity of the marks and actual confusion in the marketplace. LMI's trademark application explained that the additional marine items sold by LMI are used in conjunction with the other marine items (which are sold by both parties), and therefore, the confusion in the marketplace would extend to these additional items as well.

### B. Ownership of the GAFFRIG Trademarks

Therefore, the only remaining issue in determining the merits of the parties' claims is the validity of the mark; i.e., who owns the right to the GAFFRIG trademarks. LMI holds a federally registered trademark in the GAFFRIG PRECISION INSTRUMENTS mark,[2] which it claims is *prima facie* evidence that it owns the right to the GAFFRIG trademarks. GPI2, on the other hand, argues that it holds superior common law trademark rights, and that the federally registered trademark was achieved by fraud. A federal trademark application is always subject to previously established common law trademark rights of another party. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434-35 (7th Cir. 1999) (citing *The Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 672 (7th Cir.1982) (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:2, at 656)). In order to determine who owns the rights to the GAFFRIG

---

[2]Since the initiation of this lawsuit, LMI was issued a federal trademark registration for the GAFFRIG trademark on January 15, 2002 (U.S. Registration No. 2,528, 898), and for the GAFFRIG II trademark on February 5, 2002 (U.S. Registration No. 2,535,322).

marks, the Court must determine: first, the nature of GPI's common law rights in the GAFFRIG marks; second, whether LMI has common law rights in the GAFFRIG marks; third, whether GPI assigned its common law rights to GPI2; and fourth, whether LMI has federally registered rights in the GAFFRIG marks or whether LMI committed fraud in the procurement of its federal trademark registration.

### 1. What Rights Did GPI Have In The GAFFRIG Marks Between 1984 And 1988?

Although the parties do not dispute that GPI had common law rights in the GAFFRIG marks from 1984 to 1988, they do not agree on the nature of those rights; that is, whether the GAFFRIG marks are primarily a surname or inherently distinctive. Because the nature of the marks changes the analysis that follows, the Court will decide this issue first. The Lanham Act states that a mark that is "primarily a surname" is descriptive and may be registered only if it is shown that the mark has acquired secondary meaning, such that the mark "has become distinctive of the applicant's goods in commerce." 15 U.S.C. § 1052(e), (f). A mark is primarily a personal name, or surname, if the primary significance of the mark to the purchasing public is that of a personal name or surname. *Peaceable Planet, Inc. v. Ty, Inc.*, No. 01 C 7350, 2003 WL 22024992, at *5 (N.D. Ill. 2003) (citing *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *In re Hutchinson Tech., Inc.*, 852 F.2d 552, 554 (Fed. Cir. 1988)). If the mark is primarily a personal name, then the senior user must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark. *Johnny Blastoff,*, 188 F.3d at 433-34 (internal citations omitted). *See also Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992). In contrast, if the family feature or surname is distinctive enough to trigger recognition in and of itself,

11

then the mark may be inherently distinctive. *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir. 1992). If the mark is inherently distinctive, then the party to first use the mark has ownership rights to it.

The parties have offered no evidence that the GAFFRIG marks are inherently distinctive. Rather, the parties' evidence of the popularity and recognition of the GAFFRIG marks is attributable to the secondary meaning that has become attached to the marks. Therefore, the Court finds that the GAFFRIG marks are primarily a surname, and the question remains as to when the GAFFRIG marks acquired secondary meaning. The parties' evidence supports a finding that the GAFFRIG marks acquired secondary meaning from GPI's use of the marks between 1984 and 1988. LMI agrees that GPI was the first to use and manufacture products under the GAFFRIG PRECISION INSTRUMENTS trademark. In addition, LMI agrees that GPI established exclusive rights in the use of the GAFFRIG PRECISION INSTRUMENTS trademark on marine speedometers and related marine gauges in 1984, which Gaffrig possessed until April 12, 1988. Indeed, the evidence shows that the trademark, GAFFRIG PRECISION INSTRUMENTS, did acquire secondary meaning between 1984 and 1988, as even Livorsi admitted that by 1988, the GAFFRIG marks had acquired recognition in the marine industry as representative of a superior marine product. Thus, the GAFFRIG marks had a distinctiveness or secondary meaning warranting trademark protection before Gaffrig and Livorsi entered into the APA in 1988, and GPI had priority of ownership at that time.

## 2. Did LMI Acquire Common Law Rights In The GAFFRIG Marks By Virtue Of The APA In 1988?

LMI claims that GPI assigned all of its rights in the GAFFRIG marks to LMI by virtue of the

12

Asset Purchase Agreement (APA) Livorsi and GPI signed on April 12, 1988.[3]  GPI2, however,

argues that the APA constituted a two-year license of the GAFFRIG PRECISION INSTRUMENTS

mark to LMI.  The Court agrees with GPI2.

Contrary to LMI's arguments, the plain language of the APA shows that Livorsi purchased

all of the assets of GPI's speedometer business, except one pitot tube assembly (a speedometer-

related item) which Livorsi agreed to license from Gaffrig for nine years, and a two-year exclusive

license from GPI to manufacture and sell the speedometers with the GAFFRIG PRECISION

INSTRUMENTS mark.  During this two-year period, Gaffrig agreed not to manufacture or sell

speedometers.  The APA states, in relevant part:

> Livorsi shall have the right to use the GAFFRIG PRECISION INSTRUMENTS trade
> name in connection with the manufacture and sale of speedometers and in advertising
> subject to Section 9 herein.

APA, Section 1.

> In consideration of the purchase of the assets, GPI agrees that neither it nor James W.
> Gaffrig (who is a major shareholder of GPI) shall, during the period of two years
> which commences on the closing date, directly or indirectly, engage in or render
> services to any business engaged in manufacturing or selling finished or semi-
> finished speedometers, or acquire an interest as stockholder, director, partner, agent
> or individual, in any such business.

APA, Section 9.

LMI's arguments appear to overlook the text of the APA itself.  First, nowhere does the APA

---

[3]GPI2 attempts to argue that the APA is invalid for lack of consideration because LMI
allegedly did not pay the full $20,000 owing to Gaffrig under the APA or the required 3%
royalties to Gaffrig.  Contrary to GPI2's claims, failure to pay the full amount owing under a
contract does not render a contract invalid.  Instead, it gives GPI a remedy for breach of contract.
A contract may be invalid for want or lack of consideration, but here, GPI2 agrees that the
contract stated the consideration that must be paid.  GPI2 instead claims that the consideration
was not paid in full.  Thus, the APA is a valid agreement regardless of whether Livorsi provided
the consideration for the 1988 APA.

even suggest that Livorsi would get more than a right to use the GAFFRIG PRECISION INSTRUMENTS mark in connection with speedometers. Second, Section 1 states that it must be read in conjunction with Section 9, which specifically limited Gaffrig's exclusion from the speedometer market to only two years. Because the APA did not limit Gaffrig's use of the GAFFRIG PRECISION INSTRUMENTS mark on any other marine products, GPI2 is correct that Section 9, read in conjunction with Section 1, also limited Livorsi's exclusive use of the GAFFRIG PRECISION INSTRUMENTS marks on speedometers to two years.

LMI attempts to divert the Court's attention from the APA by pointing to extrinsic evidence which purportedly supports LMI's understanding of the APA: testimony by Gorchynsky and Livorsi regarding the purported intent of the APA to assign the GAFFRIG PRECISION INSTRUMENT mark and all derivative marks and the entire gauge business to Livorsi. However, if the language of the contract itself unambiguously answers the question at issue, the inquiry is over. *Much v. Pacific Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir. 2001) (interpreting Illinois law). "In such a case, the intent of the parties must be determined solely from the contract's plain language, and extrinsic evidence outside the 'four corners' of the document may not be considered." *Id.* (citing *Omnitrus Merging Corp. v. Ill. Tool Works, Inc.*, 256 Ill. App. 3d 31, 628 N.E.2d 1165, 1168 (Ill. App. Ct.1993)). *See also Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 635 (7th Cir. 2001) ("[A]s a general rule, an unambiguous contract should be construed without reference to extrinsic evidence....[I]f the language of the contract provides an answer, then the inquiry is over; parol evidence is neither necessary nor admissible.") (internal citations omitted). As explained above, the language of the APA did unambiguously answer the question at issue. Therefore, the Court will not consider Livorsi's and Gorchynsky's interpretation of the APA.

14

Moreover, despite LMI's arguments, its two-year right to the mark was not accompanied by the goodwill of the business. Goodwill includes the corporate identity, confidence, reputation, and recognition of the product. *Sands*, 978 F.2d at 957. GPI's agreement to provide its customer lists to LMI did not amount to a transfer as the evidence showed that Gaffrig continued to make other recognized marine products with the GAFFRIG PRECISION INSTRUMENTS and GAFFRIG marks. In addition, GPI was properly ensuring that it provided actual quality control over the products LMI produced with the GAFFRIG PRECISION INSTRUMENTS marks, as GPI was required to do in a licensing agreement. *Sterling Drug, Inc. v. Lincoln Labs., Inc.*, 322 F.2d 968 (7th Cir. 1963); Trial Tr. at 113-15, 649.

In sum, the above discussion shows that GPI did not assign its rights to the GAFFRIG PRECISION INSTRUMENTS in 1988. As such, GPI maintained its ownership of the GAFFRIG PRECISION INSTRUMENTS and GAFFRIG marks. Consequently, LMI's use of the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks on items other than speedometers during the two years of the APA license, and LMI's use of those and the GAFFRIG II marks on speedometers and other items after the two year period, constituted an infringement of GPI's common law trademark. An ex-licensee's continued use of the trademark after the period of the license is a violation of trademark law. *Gorenstein*, 874 F.2d at 435.

### 3.   Did GPI Assign Its Common Law Rights In The GAFFRIG Marks To GPI2?

GPI2 claims that GPI assigned its common law rights in its trademarks to GPI2 when Gaffrig created GPI2 on November 16, 1990. The Court agrees with GPI2. Gaffrig's actions after July 1990 demonstrate that Gaffrig assigned his rights in the marks to GPI2. In July 1990, Gaffrig became the

15

sole shareholder of GPI. Gaffrig created GPI2 in November 1990 (which Divilbiss stated was "almost immediately" after GPI's doors were closed), before GPI's assets were auctioned in December 1990, and before GPI was dissolved by the Illinois Secretary of State in December 1991. GPI2 had an almost identical workforce as GPI, including Gaffrig himself, Schultz, Angel Castenada, and Divilbiss. GPI2 began producing almost immediately the same or similar products as GPI (mufflers, flame arrestors, and throttle brackets, and eventually even more marine products), and GPI2 affixed the GAFFRIG marks on these products. The evidence above demonstrates that the goodwill in the GAFFRIG marks traveled with Gaffrig to GPI2, and that Gaffrig assigned his trademark rights to GPI2. Thus, GPI2 succeeded to GPI's rights in the GAFFRIG marks.

LMI, however, argued that GPI could not have assigned its trademark rights to GPI2 for several alternative reasons: (1) GPI abandoned its rights to the GAFFRIG marks when it signed the APA with Livorsi; (2) GPI transferred its rights to the GAFFRIG marks in an Assignment for the Benefit of Creditors; (3) the mark inured to GPI's, rather than Gaffrig's benefit; (4) there was no written assignment from GPI to GPI2; or (5) the alleged transfer of the mark was not accompanied by the transfer of any physical assets. The Court deals with each of these arguments in turn.

### a. Did GPI abandon its rights to the GAFFRIG marks when it signed the APA with Livorsi?

LMI argues that GPI abandoned all of its rights to the GAFFRIG marks under the APA before it could transfer any rights to GPI2. A mark is deemed abandoned if its use has been discontinued with an intent not to resume such use or if there has been nonuse for 3 consecutive years. 15 U.S.C.A. § 1127. Contrary to divesting or abandoning its trademark rights, however, the APA expressly contemplated GPI's return to the speedometer market after two years. In addition,

16

GPI continued to manufacture other marine products with the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks, such as mufflers and flame arrestors, throughout the two year term and afterward.

Moreover, this Court has already held that the APA only conveyed a license to LMI to use the GAFFRIG marks. A licensee's use of a mark inures to the benefit of the licensor, and the licensee acquires no ownership rights in the mark itself. *Gorenstein Enter.s, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) (internal citations omitted); *Smith v. Dental Prod.s Co.*, 140 F.2d 140, 148 (7th Cir. 1944) ("A grant of an exclusive use of a trade-mark, limited as to duration and place, whether made in contracts for sale of its associated wares or by specific license, does not convey title or establish ownership of the trade-mark in the licensee or in one who purchases marked goods for resale."); *United States Jaycees v. Phila. Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981); *Prof'l Golfers' Assn. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975). Therefore, the Court finds that GPI did not abandon its rights to the GAFFRIG marks when it signed the APA.

### b. Did GPI transfer its rights to the GAFFRIG marks in an Assignment for the Benefit of Creditors?

LMI also alleges that GPI could not have assigned its rights in the marks to GPI2 because GPI transferred all of its assets in an Assignment for the Benefit of Creditors ("ABC") before the assets were auctioned off in December 1990. Because the ABC document is not in the record, LMI relies on its witness, Robert Divilbiss for the proposition that all of GPI's assets were transferred in the ABC; however, Divilbiss admitted that he never actually read the ABC document, and he could not remember exactly when the transfer occurred. In contrast, Schultz testified that Gaffrig, as the

sole shareholder of GPI and GPI2 at the time, assigned his common law rights in the GAFFRIG marks to GPI2, in addition to transferring necessary equipment, machinery, employees, and raw materials to GPI2.

The existence of the ABC and the accompanying transfer of assets does not necessarily mean that the GAFFRIG marks were assigned for the benefit of creditors as well. "[A] trademark owner will not necessarily be found to have abandoned marks upon liquidation of a business if the owner intends to reestablish his business." *Koretz v. Heffernan*, No. 92 C 5419, 1993 WL 524438, at *6 (N.D. Ill. 1993) (citing *Berni v Int'l Gourmet Rest.s of Am., Inc.*, 838 F.2d 642, 647 (2d Cir. 1988)). In *Berni*, the Second Circuit held that:

> We have recognized that a trademark may be retained by its owner even though the existing business' assets are sold. Where the owner has sold its equipment, inventory and other assets, discharged its work force and announced that it has discontinued manufacturing its products, it may nevertheless retain a protectable interest in its mark, if it evidences an intention not to abandon the mark. That intention can be inferred from evidence that the owner is undertaking to resume use of the mark within a reasonable time after the sale of the other assets.

*Berni*, 838 F.2d at 646-647 (internal citations omitted). *See also Pappan Enter.s, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3rd Cir. 1998) ("Courts have recognized that a trademark owner's decision to reduce the size of its business or to cease operations alone does not undermine the owner's legal right to enforce and protect its trademark.") The Court finds that the evidence as laid out above shows that the GAFFRIG marks were assigned to GPI2, and not for the benefit of creditors.

### c. Did the mark inured to GPI's or Gaffrig's benefit?

Even if the marks were not assigned for the benefit of creditors, however, LMI argues that Gaffrig, as an individual shareholder, could not assign the rights to the marks because a trademark

18

inures to the corporation and not to an individual. Although generally this principle is true, courts may presume that a real person who owns all the stock of a corporation controls the corporation so that use of the mark by the corporation inures to the benefit of the real person, who is presumed to be the "owner" of the mark. *See In re Hand*, 231 U.S.P.Q. 487 (T.T.A.B. 1986) (Trademark Manual of Examining Procedure § 1201.03(b) presumption of sufficient control over a wholly owned subsidiary corporation applies to a real person as well as to a corporation.) *See also Smith v. Coahoma Chemical Co. Inc.*, 264 F.2d 916, 920 (C.C.P.A. 1959); McCarthy, § 16:36, at 16-59. In this case, Gaffrig, whose name forms the basis of the marks at issue, became the sole owner of GPI after July 1990, before the ABC or the auction of the assets. Consequently, the use of the GAFFRIG marks inured to Gaffrig's benefit, and he was the owner of the GAFFRIG trademarks. Therefore, Gaffrig had the ability to assign his rights in the marks to GPI2, and he did so as explained above.

### d. Does the lack of a written assignment from GPI to GPI2 preclude an assignment?

LMI next argues that GPI2's claim of an assignment of the rights in the marks fails because GPI2 has no evidence of a written assignment. "Assignments of trademark rights do not have to be in writing, but an implied agreement to transfer requires conduct manifesting agreement, not just conduct that might be characterized as being shady or otherwise inequitable." *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997) (internal citations omitted). Unlike in *TMT*, however, the evidence here is not ambiguous or contradictory. As explained above, Gaffrig owned the GAFFRIG marks, he did not give the marks up in the ABC, and then he did all he could, short of a written document, to assign the GAFFRIG marks to GPI2. Gaffrig created GPI2 in November 1990 (which Divilbiss stated was "almost immediately" after GPI's doors were closed),

before GPI's assets were auctioned in December 1990, and before GPI was dissolved by the Illinois Secretary of State in December 1991. GPI2 had an almost identical workforce as GPI, including Gaffrig himself, Schultz, Castenada, and Divilbiss. GPI2 began producing almost immediately the same or similar products as GPI, and GPI2 affixed the GAFFRIG marks on these products. Therefore, Gaffrig's conduct manifested an agreement to assign his trademark rights to GPI2.

   e.   **Did Gaffrig transfer his rights in the marks even though the alleged transfer of the marks was not accompanied by the transfer of any physical assets?**

Finally, LMI argues that Gaffrig did not transfer his rights in the GAFFRIG marks to GPI2 because there was no accompanying transfer of any physical assets. This argument is without merit. Even if the physical assets were transferred in the ABC, "transfer of a mark need not be accompanied by the transfer of any physical or tangible assets in order to be valid. All that is necessary is the transfer of the goodwill to which the mark pertains." *Sands*, 978 F.2d 947, 956 (7th Cir. 1992) (internal citations omitted). In addition, "assignments of marks separate from the underlying business have been upheld when the assignee is producing a product . . . substantially similar to that of the assignor [such that] consumers would not be deceived or harmed or when there is continuity of management. Thus, a trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark." *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1059 -1060 (2nd Cir. 1985). In this case, GPI2 produced products substantially similar to GPI and kept nearly the same workforce as at GPI. The evidence above demonstrates that the goodwill in the GAFFRIG marks traveled with Gaffrig to GPI2, and that Gaffrig did assign his trademark rights to GPI2. Thus, GPI2 succeeded to GPI's rights in the

20

GAFFRIG marks.

4. **Does LMI Have Any Ownership Rights In The GAFFRIG Marks By Virtue Of Its Federal Trademark Registration Of The GAFFRIG PRECISION INSTRUMENTS Name?**

LMI claims that it is entitled to a presumption that its federal registration of the GAFFRIG PRECISION INSTRUMENTS trademark is valid, and GPI2 bears the burden of overcoming the presumption by clear and convincing evidence. GPI2 claims that LMI committed fraud in the procurement of its federal registration, and that the registration is thus invalid. LMI is correct that the registration of a mark is *prima facie* evidence of "the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115. *See also* 15 U.S.C. § 1057 (b). In addition, a mark that has become incontestable -- such as happened in this case in 1999 – "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." *Id.*

However, a federal trademark registration, even one that has grown to incontestability, can be vitiated with proof of fraud. A federal trademark registration "shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115. With regard to an incontestable mark, section (b) states that "[s]uch conclusive evidence of the right to use the registered mark . . . shall be subject to the following defenses or defects: (1) That the registration or the incontestable right to use the mark was obtained fraudulently." 15 U.S.C. § 1115 (b). Furthermore, Section 15 U.S.C. § 1065, specifically excepts from incontestable status

situations where there are "ground[s] for which application to cancel may be filed at any time under paragraphs (3) and (5) of section 1064 of this title," and where "the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark." 15 U.S.C. § 1065.

GPI2 claims that LMI committed fraud in the procurement of its federal registration of the GAFFRIG PRECISION INSTRUMENTS mark by stating to the PTO that (1) the name "Gaffrig" had no significance other than to identify LMI's products; and (2) Livorsi had used the mark since 1984.[4] LMI disputes these claims, arguing that it did not intentionally make any false or misleading statements to the PTO in connection with its application for registration of the GAFFRIG PRECISION INSTRUMENTS mark. To establish that LMI committed fraud in the procurement of the federal registration, GPI2 must prove by clear and convincing evidence: (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the intention to induce action or refraining from action in reliance on the

_____

[4]The Court finds no merit in GPI2's second claim of fraud. On November 11, 1991, in a Declaration to the Patent and Trademark Office, Livorsi stated that the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks were first used in the summer of 1984. Livorsi stated that he did not intend to represent that the first use was by Livorsi, and indeed, the first use by Gaffrig was in 1984. The Trademark Trial and Appeals Board has repeatedly held that an erroneous date of first use is immaterial to an allegation of fraud, because an erroneously asserted date, even if intentional, could not result in the allowance of a registration which would otherwise not be allowed, so long as the applicant used the mark prior to filing the application. *Western Worldwide Enter.s Group Inc. v. Qinqdao Brewery*, 17 U.S.P.Q.2d 1137, 1141 (T.T.A.B. 1990) (The Board repeatedly has held that the fact that a party has set forth an erroneous date of first use does not constitute fraud unless, inter alia, there was no valid use of the mark until after the filing of the application). In this case, however, GPI2 has provided no evidence that LMI intentionally misstated the date of his first use, and thus GPI2 cannot satisfy the elements of fraud in this instance.

misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from the reliance. *Thomas Industries, Inc. v. L.E. Mason Co.*, No. 90 C 4099, 1991 WL 83821, at \*2 (N.D. Ill. May 12, 1991) (citing *San Juan Prod.s, Inc. v. San Juan Pools of Kansas, Inc.*, 849 F .2d 468, 473 (10th Cir.1988)). *See also United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 -1227 (10th Cir. 2000); *Texas Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc.*, 951 F.2d 684, 693 (5th Cir. 1992).

LMI attempts to argue that GPI2 is merely alleging "fraud in the oath," that is, a false statement in the trademark registration applicant's oath "that no other person, firm, corporation, or association, to the best of [the applicant's] knowledge and belief, has the right to use such mark in commerce." *See* 15 U.S.C. § 1051. In matters of fraud in the oath, an applicant's good faith belief that it is the senior user is sufficient to negate allegations of fraud. *San Juan Prods.*, 849 F.2d at 472 (citation omitted); *United Phosphorus,*, 205 F.3d at 1226 -1227; McCarthy, § 31:77, at 31-140. However, unlike most of the cases where fraudulent procurement is at issue, the fraud at issue here did not occur in the oath Livorsi took in his trademark registration application. In this case, the PTO did not leave room for LMI's "good faith belief" in whether he was the senior user. The PTO initiated an office action on June 4, 1992, requiring that "the applicant must indicate whether Gaffrig has any significance in the relevant trade, any geographical significance or any meaning in a foreign language. 37 C.F.R. section 2.61(b)." Livorsi responded that "[t]he name "Gaffrig" has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments and has no geographical significance."

GPI2 claims that this response constitutes fraudulent procurement, and this Court agrees. First, this misrepresentation was false because GPI2 has shown by clear and convincing evidence

that its use of the name "Gaffrig" did have significance in the marine trade at the time of LMI's trademark application. In addition, this representation is material because without this misrepresentation, the federal registration should not, or would not, have been issued. Second, LMI knew that the representation was false. Livorsi admitted that he knew that GPI2 was producing at least some marine items, such as mufflers and flame arrestors, at the time of LMI's registration application. Thus, even according to Livorsi's testimony, the name "Gaffrig" had at least some significance in the relevant trade. Third, LMI intended to induce the PTO into relying on his representation and issuing him a registered trademark. Fourth, the PTO reasonably relied on this misrepresentation because in his application, Livorsi verified that all facts set forth in his application were true to the best of his knowledge. And, fifth, GPI2 has proved damages proximately resulting from the reliance, as the PTO registered GPI2's trademark to LMI due to LMI's misrepresentations.

LMI's arguments to the contrary are unavailing. LMI argues that an applicant has no duty to investigate and report to the PTO all other possible users of the same or a similar mark, or the fact that "Gaffrig" was James Gaffrig's surname. Although it is true that in the initial application there is no duty to so investigate and report, as explained above, in this case the PTO explicitly requested this information. Moreover, the Seventh Circuit contemplated that the registration process would include an *ex parte* search and examination by the PTO examiner. *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 671 (7th Cir. 1982). The PTO's office actions are part of such a search and examination, and LMI was obligated to truthfully answer whether there was other significant use of the mark – regardless of whether LMI believed them to be junior users – in response to the PTO questioning. LMI further points out that the Trademark Manual of Examining Procedure (2d Edition, May 1993, rev. April 1997) at 1211.02(a) places the initial burden on the examining

24

attorney to establish the mark is primarily a surname – which is exactly why LMI is under a duty to answer truthfully when the examiner followed up with an office action asking for the significance of the name Gaffrig. Therefore, the Court finds that GPI2 proved clearly and convincingly that LMI committed fraud in its trademark application.

**II.** **False Designation of Origin Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and Unlawful Trademark Imitation Under the Illinois Counterfeit Trademark Act, 765 ILCS § 1040/2.**

Both GPI2 and LMI brought claims for false designation of origin under the Lanham Act, and LMI also claimed unlawful trademark imitation under Illinois law. Any person who uses a false designation of origin in connection with goods and services that is likely to cause confusion as to: (1) the origin of that company's goods; (2) that company's affiliation, connection or association with another company; or (3) the endorsement or approval of the goods by another person, is liable to anyone who is or is likely to be damaged by the false designation of origin. 15 U.S.C. § 1125. A plaintiff must prove the following three elements to state a claim for false designation of origin under the Lanham Act: "(1) that the defendant used a false designation of origin or false description or representation in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that the plaintiff is a person who believes he is likely to be damaged as a result of the misrepresentation." *Kennedy v. Nat'l Juvenile Detention Ass'n,* 187 F.3d 690, 695-96 (7th Cir. 1999) (citing *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990)).

Generally, allegations of false designation of origin are either "passing-off" claims or "reverse passing-off" claims. *Francorp, Inc. v. Siebert,* No. 00 C 1248, 2002 WL 731170, at *2 (N.D. Ill. 2002) (citing *Web Printing,* 905 F.2d at 1203 n.1.) LMI's claim is one of "passing-off,"

25

that GPI2's use of the GAFFRIG and GAFFRIG PERFORMANCE INDUSTRIES marks on its marine products created a likelihood of confusion by "passing off" GPI2's products as LMI's products. *Francorp*, 2002 WL 731170, at *2. GPI2 alleges claims of "passing off and "reverse passing-off." GPI2 claims that LMI removed the name or trademark of GPI2's product and sold it with a different name, thus confusing the public. *Id.* Livorsi testified that LMI did, in fact, remove GPI2's marks and replace them with LMI's GAFFRIG marks. In addition, GPI2 claims that LMI's continued use and registration of the GAFFRIG marks after its license to use the mark expired constituted "palming off" (the same as "passing off"), as it falsely led the public to believe that the GAFFRIG marks or GPI were still connected to LMI. *See Kennedy*, 187 F.3d at 696.

A claim for unlawful trademark imitation under the Illinois Counterfeit Trademark Act is similar to an allegation of "passing off" or "palming off" under a Lanham Act claim for false designation of origin. Illinois law, 765 ILCS § 1040/2, provides for criminal penalties for "[w]hoever counterfeits or imitates any trade-mark or service mark of which he or she is not the rightful owner or in any way utters or circulates any counterfeit or imitation of such a trade-mark or service mark or knowingly uses such counterfeit or imitation or knowingly sells or disposes of or keeps or has in his or her possession, with intent that the same shall be sold or disposed of. . . ." Courts analyze this claim in the same manner as the Lanham Act claim. *See Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 379 (7th Cir. 1996); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 17 F. Supp. 2d 775, 780 (N.D. Ill. 1998).

LMI's claims must fail because the Court has found that GPI2 had a valid ownership right in the GAFFRIG marks. Therefore, GPI2's use of the GAFFRIG PERFORMANCE INDUSTRIES and GAFFRIG marks do not constitute a false designation of origin, but rather properly show GPI2's

ownership of the marks. To the contrary, LMI's use of the GAFFRIG marks, and its admitted removal of GPI2's marks and replacement with its own, constituted a false designation of origin since LMI did not have a valid ownership right in the marks. In addition, GPI2 was damaged by LMI's passing off and reverse passing off of the marine products it sold.

## III. Laches

LMI further claims that GPI2 should be barred from raising any claims for trademark infringement or false designation of origin because GPI2 had known for years about LMI's use of the GAFFRIG marks before initiating this lawsuit. The Lanham Act specifically contemplates that both injunctive relief and awards of damages for violations of 15 U.S.C. § 1125 shall be subject to the principles of equity, which include the doctrine of laches. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 822 (7th Cir. 1999).

> The equitable doctrine of laches is derived from the maxim that those who sleep on their rights, lose them. Laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it. For laches to apply in a particular case, the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom.

*Hot Wax*, 191 F.3d at 820. In addition, for laches to occur, a plaintiff must have actual or constructive notice of the defendant's activities. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 793 (7th Cir. 2002). "[A] trademark owner is chargeable with information it might have received had due inquiry been made." *Id.* at 793. GPI2 had actual or constructive notice of LMI's infringing activities as early as 1993, when LMI received a federally registered trademark for GAFFRIG PRECISION INSTRUMENTS, because registration of a mark provides constructive notice throughout the United States of the registrant's claim to ownership. 15 U.S.C. § 1072; *Park 'N Fly,*

*Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 202 (U.S. 1985). In addition, Schultz testified that as early as 1993, GPI2 was purchasing gauges, instruments and controls from LMI. GPI2 received these items with the GAFFRIG marks as they had been attached by LMI, and Schultz testified that GPI2 did not alter these marks.

With regard to the first prong of the laches test – an unreasonable lack of diligence by the party against whom the defense is asserted – the Seventh Circuit has stated that "it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished." *Hot Wax*, 191 F.3d at 823 (citation omitted). In *Chattanoga*, the Seventh Circuit held that courts should refer to analogous state statutes of limitations to determine whether a presumption of laches should apply in a Lanham Act case. *Chattanoga*, 301 F.3d at 793-94. The Seventh Circuit upheld the district court's finding that the party's delay was unreasonable where the district court held that the most analogous Illinois limitation period was the three-year statute of limitations found in the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10.

In *Chattanoga*, the plaintiff's delay of at least nine years created a presumption of laches because it far exceeded the statute of limitations in the Illinois Consumer Fraud and Deceptive Business Practices Act. Because the plaintiff failed to rebut this presumption and excuse its delay, the district court found the plaintiff's delay to be unreasonable. *Chattanoga*, 301 F.3d at 793 -794. In this case GPI2 delayed a *maximum* of nine years (LMI's license to use the GAFFRIG marks expired in 1990 and GPI2 did not file suit until 1999) and a minimum of six years (when in 1993 GPI2 began purchasing items from LMI and LMI registered the mark). Using the same statute of

28

limitations used in *Chattanoga* as a guide, the Court finds GPI2's delay unreasonable under the reasoning of *Chattanoga* and *Hot Wax*. A presumption of laches arose after the three year period set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act, and GPI2 failed to rebut this presumption. GPI2 has put forth no argument or facts justifying its six to nine year delay. Rather, GPI2 tries to argue that it did not have notice of LMI's use and registration of the GAFFRIG marks until 1995, even though Schultz's testimony shows that GPI2 had notice by 1993. Moreover, GPI2 does not even attempt to justify its delay after 1995, which is still greater than the relevant three year statute of limitations. Therefore, GPI2 failed to rebut the presumption of laches and demonstrated an unreasonable lack of diligence in asserting its trademark infringement claims.

With regard to the second prong of the laches test – prejudice – the Seventh Circuit has held that:

> A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed. In this context, we have explained that laches is a question of degree. To this end, if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required.

*Hot Wax*, 191 F.3d at 824 (internal citations omitted). Rather than seeking cancellation in the PTO or otherwise contesting LMI's use of the marks, in 1996 GPI2 expanded its use of the GAFFRIG and GAFFRIG PERFORMANCE INDUSTRIES marks by manufacturing a broader range of marine products, similar to LMI's products, and applying the marks to them. In the meanwhile, LMI was investing a great deal of money in the GAFFRIG marks in advertising, marketing, legal fees, and registration fees, and LMI presented tax returns and other evidence demonstrating this. This is

29

similar to the situation in *Hot Wax*, where the Seventh Circuit found the defendant was prejudiced because (i) plaintiff permitted defendant's advertising and product development to go unchecked for years; (ii) plaintiff idly sat by while defendant invested significant amounts of time and money in product development and advertising; and then, (iii) rather than contesting defendant's rights, plaintiff attempted to break into the same market with similar products. Had GPI2 pressed its claims in a timely manner, LMI "could have invested its time and money in other areas or simply renamed its products." *Hot Wax*, 191 F.3d at 824. Accordingly, the Court finds that GPI2 unreasonably delayed bringing suit, and LMI was thereby prejudiced.

## IV. Remedies

As a remedy for LMI's trademark infringement and false designation of origin, GPI2 seeks damages and wrongfully derived profits from LMI, in addition to an injunction against LMI's use of the GAFFRIG marks. A finding of laches bars a trademark infringement plaintiff, GPI2, from recovering damages or wrongfully derived profits during the time prior to filing suit. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir. 1978). However, "[u]pon a showing of infringement . . . the plaintiff may still be entitled to injunctive relief . . . and to damages and profits for the period subsequent to the filing of suit" because of the continuous nature of trademark infringement. *Id.* Under the Lanham Act courts have power to grant injunctions according to the principles of equity. An injunction is only denied "if the delay is so prolonged and inexcusable that it would be inequitable to permit the plaintiff to seek injunctive relief as to future activities." *Hot Wax*, 191 F.3d at 825. In *Hot Wax*, the court found that the plaintiff's delay was prolonged and inexcusable because it waited more than 20 years to file suit. *Id.* The delay in the instant case – six to nine years – does not fall into this category, and GPI2 may acquire injunctive

30

relief. The Court, however, denies GPI2 damages and profits for the period subsequent to the filing of suit because of GPI2's failure to excuse its delay or to provide evidence of these damages or profits.

GPI2, however, argues that LMI should be barred from using its defense of laches because LMI had unclean hands in the fraud it committed in procurement of its trademark application. Fraud in the procurement of a registered mark constitutes unclean hands. *Elec. Info. Publ'ns, Inc. v. C-M Periodicals, Inc.*, 163 U.S.P.Q. 624, 633 (N.D. Ill. 1969). A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances. The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice. *Hot Wax*, 191 F.3d at 825 (citing *Precision Inst. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief")). *See also Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002).

In this case, the Court would come to the same result whether or not LMI's unclean hands barred it from asserting the laches defense.

> In the interests of justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing injury to the public. . . . The relative extent of each party's wrong upon the other and upon the public should be taken into account and an equitable balance struck.

*Republic Molding Corp. v. B. W. Photo Utils*, 319 F.2d 347, 350 (9th Cir. 1963). An equitable balance in this case involves granting GPI2 an injunction against LMI's use of the GAFFRIG marks, but not rewarding GPI2 with damages. Whether or not laches applies to GPI2, this Court recognizes

that GPI2 is not clear of wrong, since not only did it wait many years before raising the issue of LMI's infringement before the Court, but GPI2 allowed LMI to continue spending money on advertising while GPI2 attempted to break further into the market. Moreover, despite the fraud in its application, LMI believed that it had a senior right to the GAFFRIG marks. Therefore, because of LMI's violations of Section 1125 of the Lanham Act and its fraudulent registration of the GAFFRIG marks, GPI2 is entitled to an injunction under 15 U.S.C. § 1116 against LMI's use of any trademark or tradename incorporating the word GAFFRIG, or the use of such a mark on, or in connection with the sale of, any marine products. However, no damages will be awarded to GPI2 in light of LMI's belief that it had senior rights to the marks and GPI2's delay.

Furthermore, "[i]n any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." Lanham Act, § 37, 15 USCA § 1119. In addition, the Lanham Act permits cancellation of a registration at any time if the registration of the mark was obtain fraudulently, even if the mark has acquired incontestable status. Lanham Act, §§ 14(c), 33(b)(1); 15 U.S.C. §§ 1064(c), 1115(b)(1). A party in an infringement suit is not barred from counterclaiming for cancellation merely because he never petitioned the PTO to cancel. *Nancy Ann Storybook Dolls, Inc. v. Dollcraft Co.*, 197 F.2d 293, 295-96 (9th Cir. 1952). Therefore, the Court orders the cancellation of the federal trademark registrations issued to LMI for the (1) GAFFRIG PRECISION INSTRUMENTS trademark (U.S. Registration No. 1,801,915); (2) GAFFRIG trademark (U.S. Registration No. 2,528,898); and (3) GAFFRIG II trademark (U.S. Registration No. 2,535,322).

In conclusion, the Court orders that: (1) GPI2's request for an injunction against LMI's use

of any trademark or tradename incorporating the word GAFFRIG, or the use of such a mark on, or

in connection with the sale of, any marine products, is GRANTED; and (2) LMI's federal trademark

registrations for the GAFFRIG PRECISION INSTRUMENTS trademark (U.S. Registration No.

1,801,915); the GAFFRIG trademark (U.S. Registration No. 2,528,898); and the GAFFRIG II

trademark (U.S. Registration No. 2,535,322) will be CANCELLED. All other relief is DENIED.

IT IS SO ORDERED.

_12/19/03_
Dated

_Wm. J. Hibbler_
The Honorable William J. Hibbler

33